333 Conn. 225     SEPTEMBER, 2019     225

State *v.* Ayala

## STATE OF CONNECTICUT *v.* VINCENTE AYALA
## (SC 19888)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

### *Syllabus*

Convicted of the crimes of murder and conspiracy to commit murder in connection with the shooting death of the victim, the defendant appealed to this court, claiming that the trial court had improperly admitted certain testimony. At trial, the state introduced evidence indicating that the defendant and the victim had been members of a particular street gang and that the victim, prior to being murdered, was planning to leave that gang to join another gang. T, another gang member, testified that a gang leader, after learning about the victim's intent to leave the gang, ordered T to kill the victim and that, when T refused, the defendant volunteered to do so. Another member of the gang, R, testified that he had been in the victim's vehicle with, among others, the gang leader, the defendant, and the victim on the night of the victim's death. R testified that he had heard a gunshot shortly after leaving the vehicle and that, about one-half hour later, the defendant admitted to him that he had killed the victim. R testified that he then went back to the vehicle and saw the victim's lifeless body. R also testified that, a few days later, the gang leader told him that the defendant had killed the victim at his direction. In addition, T testified that he had told the victim prior to the murder about the threat to the victim's life and that the defendant had later expressed remorse to T for having killed the victim. Another witness, W further testified that the victim had made statements to him on the night of the murder in which the victim expressed fear of the gang. The defendant moved to preclude R's testimony regarding the statement made by the gang leader to R that the defendant had killed the victim at the gang leader's direction and W's testimony regarding the victim's fear of the gang. The trial court denied the defendant's motions, concluding, inter alia, that R's testimony regarding the gang leader's statement to him was admissible under the hearsay exception for statements made by a coconspirator and that W's testimony was relevant evidence of the victim's state of mind. On appeal from the judgment of conviction, *held*:

1. This court declined to address the substance of the defendant's claim that the trial court improperly had admitted R's testimony regarding the gang leader's statement to R that the defendant had killed the victim at the gang leader's direction because, even if the admission of that testimony was improper, the defendant failed to meet his burden of demonstrating harm; even if the trial court improperly admitted that portion of R's testimony under the coconspirator exception to the hearsay rule, this court had a fair assurance that the admission of the chal-

State *v.* Ayala

lenged testimony did not substantially affect the verdict because it was not highlighted in the state's closing argument and was largely cumulative of, and corroborated by, other evidence presented by the state at trial, including the defendant's own admissions to R and T that he killed the victim, R's testimony regarding his observation of the victim's body in the car immediately after the defendant admitted to R that he had killed the victim, and T's testimony that the defendant had volunteered to kill the victim and had expressed remorse for having done so.

(*Three justices dissenting in one opinion*)

2. The trial court did not abuse its discretion in determining that the victim's state of mind with respect to his fear of the gang was relevant evidence of the deteriorating nature of the victim's relationship with the gang, from which the jury could reasonably infer the defendant's motive to kill the victim and also in determining that the admission of W's testimony regarding the victim's statements of fear was not unduly prejudicial; the victim's statements to W that he feared the gang provided a sufficient link to the defendant to warrant the admissibility of W's testimony, and independent, corroborating evidence, including testimony regarding the circumstances surrounding the gang leader's order, the defendant's agreement to follow that order, and the victim's knowledge of the threat made on his life, allowed the jury to infer motive from the victim's expression of fear without resorting to impermissible speculation.

Argued September 20, 2018—officially released September 24, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, criminal possession of a firearm and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the court, *Alander, J.*, denied the defendant's motion in limine; thereafter, the charges of murder and conspiracy to commit murder were tried to the jury before *Alander, J.*; verdict of guilty; subsequently, the defendant was tried to the court, *Alander, J.*, on the charges of criminal possession of a firearm and carrying a pistol without a permit; finding of not guilty; thereafter, the court, *Alander, J.*, denied the defendant's motion for a new trial and rendered judgment of guilty in accordance with the verdict and the finding, from which the defendant appealed to this court. *Affirmed.*

State *v.* Ayala

*Christopher Y. Duby*, assigned counsel, with whom, on the brief, was *Robert L. O'Brien*, assigned counsel, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom were *John P. Doyle, Jr.*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. This appeal arises from a judgment of conviction against the defendant, Vincente Ayala, on the charges of murder in violation of General Statutes § 53a-54a and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a.[1] On appeal, the defendant raises two evidentiary claims.[2] First, he claims that the trial court improperly admitted testimony implicating him in the murder under the coconspirator exception to the hearsay rule. Second, he claims that the trial court improperly admitted certain state of mind evidence. We disagree with both claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. The victim, Thomas L. Mozell, Jr., and the defendant were members of Piru, a nationwide street gang affiliated with the Bloods that has a local presence in New Haven. An individual known as "Terror," a gang leader, believed that the victim had disrespected the gang. In particular, Terror and the members of Piru believed that the victim was planning to leave Piru to join a dif-

---

[1] The state also charged the defendant with criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The defendant elected to be tried by the court on these charges, and the court acquitted him on both.

[2] We note that the defendant does not claim that the admission of evidence violated any of his constitutional rights. Therefore, we review his claims solely for evidentiary error.

State *v.* Ayala

ferent gang and that he would retaliate against them once he left. As a result, in a meeting that included Terror, Timothy Thomas, the defendant, and several other gang members, Terror ordered Thomas, as the "hood enforcer" of the gang, to kill the victim.[3] Thomas refused, however, because he was close friends with the victim. At that point, the defendant volunteered to carry out Terror's order to kill the victim. Later that day, Thomas spoke to the victim and warned him of the threat the gang now posed to his life.

Not long after the meeting, the defendant carried out Terror's order by shooting the victim in the head while he, Terror, and several other gang members were smoking marijuana inside of the victim's vehicle. Thirty minutes after the shooting, the defendant admitted to another gang member, Jordan Richard,[4] that he had shot the victim.

The next day, the police found the victim dead in his vehicle with a fatal gunshot wound to his head. Also on the day following the murder, the defendant told Thomas that he felt badly about what he had to do but that Terror had ordered him to kill the victim.

Following the defendant's arrest and a weeklong trial, the jury returned a verdict of guilty on charges of murder and conspiracy to commit murder. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of 55 years of

---

[3] Thomas explained that the Piru gang has a hierarchical structure and that, if a lower ranking member does not follow the orders of a higher ranking member, the hood enforcer is the member that has the duty of imposing discipline on the lower ranking member. He also testified that, as newer members of the Piru gang, both he and the defendant were expected to try to rise up in ranks of the gang. One way to rise up in the ranks was following orders to kill. At the time of Terror's order, Thomas had been a member of the Piru gang for six or seven months.

[4] We note that Richard's name is spelled incorrectly in various written motions and transcripts. We refer to him as Richard because that spelling is consistent with the manner in which he identified himself at trial.

State *v.* Ayala

incarceration. This appeal followed.[5] Additional relevant facts will be set forth as necessary.

I

The defendant first claims that the trial court incorrectly admitted certain testimony from Richard under the coconspirator exception to the hearsay rule. This claim relates specifically to Richard's testimony that, several days after the murder, Terror told him that the defendant had killed the victim at Terror's direction. The defendant contends that this testimony does not fall within the coconspirator exception because there was insufficient evidence that (1) a conspiracy existed between Terror and the defendant at the time Terror made those statements, and (2) Terror made the statements in furtherance of the conspiracy.

The state counters that the trial court properly admitted Richard's testimony pursuant to the coconspirator exception. The state argues that Terror's statements were made during, and in furtherance of, the conspiracy because, notwithstanding the fact that the murder had occurred several days before Terror relayed the details to Richard, the conspiracy still was ongoing. The state further claims that Terror's statements were made in furtherance of the conspiracy because they embroiled Richard deeper into the conspiracy in order to prevent him from going to the police. The state also contends that, even if the trial court improperly admitted Richard's testimony regarding Terror's statements, any error was harmless. We agree with the state's latter contention and, therefore, do not address the substance of the defendant's evidentiary claims regarding the coconspirator exception. Specifically, we conclude that any error in admitting the testimony under the coconspirator exception to the hearsay rule was harmless.

[5] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Ayala

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to the start of the second day of trial, the defendant filed a motion in limine in anticipation of the state's calling Richard as a witness. The defendant sought to preclude Richard's testimony regarding statements made to Richard by Terror detailing the killing, including how the defendant shot the victim. The trial court heard argument by counsel. Relying on evidence that already had been presented at trial and on the state's representations of Richard's expected testimony, the court determined that the state had established, by a preponderance of the evidence, the requirements for admission under the coconspirator exception. The court, therefore, denied the motion and allowed Richard to testify regarding Terror's statements.

Richard testified as follows at trial. On the evening of the murder, he and other members of Piru were at the house of fellow gang member, Davon Youmans, when he saw Youmans hand Terror a .40 caliber handgun. Terror put the gun in his waistband. Shortly thereafter, Terror, the victim, Richard and another gang member, Montese Gilliams, went to smoke marijuana in the victim's vehicle, which was parked just down the street from Youmans' house. Richard testified that they got into the victim's car and that the victim sat in the driver's seat, Gilliams sat in the front passenger seat, Terror sat behind the victim, and Richard sat behind Gilliams. They soon were joined by the defendant at which point Richard moved to the rear middle seat and the defendant sat behind Gilliams on the passenger side of the car. The others then told Richard to get out of the vehicle. Obeying those orders, Richard got out of the vehicle and went back to Youmans' house where he began playing cards. About twenty minutes later, Richard heard a gunshot. He remained inside the house playing cards.

About thirty minutes after Richard heard the gunshot, the defendant came inside Youmans' house wearing dif-

State *v.* Ayala

ferent clothes and acting cocky and arrogant. The defendant then told Richard that he had shot the victim. At first, Richard did not believe him, so the defendant told Richard to "go see for yourself." Richard then went back to the victim's vehicle, got inside the vehicle and saw the victim's lifeless body.

Richard also testified that, a couple of days later, Terror asked Richard to accompany him to New York City. He went with Terror and stayed there for five or six days. It was during this time in New York City that Terror made the statement to Richard that is at issue in this appeal. In particular, Terror reportedly said that he, the defendant, and the victim had been inside of the victim's vehicle, he had handed the gun to the defendant, he had looked over at the defendant, and the defendant then shot the victim. The defendant asserts that it was error for the trial court to admit this statement under the coconspirator exception to the hearsay rule because Terror made the statement days after the murder occurred and the conspiracy had ended. As a result, the defendant argues, the statement could not have been made in furtherance of a conspiracy. The defendant further argues that this evidentiary error was harmful.

We assume, without deciding, that it was improper for the trial court to admit Richard's testimony regarding Terror's statements under the coconspirator exception to the hearsay rule. Nevertheless, we conclude that the defendant has failed to meet his burden of establishing harm under the circumstances of this case.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the . . . testimony in the prosecution's case,

State *v.* Ayala

whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Bouknight*, 323 Conn. 620, 626–27, 149 A.3d 975 (2016).

As the harmless error standard requires, we must examine the impact that the challenged statements had on the jury and the result of the trial. Our review of the evidence assures us that this evidence did not substantially sway the jury. To be sure, although Richard's testimony was generally important to the state's case, particularly in light of limited physical evidence, the specific statement at issue was largely cumulative of other evidence and also corroborated by other evidence on material points.

Indeed, perhaps the most significant evidence was the defendant's own admission. Richard testified that, on the night of the murder, he heard a gunshot shortly after he left the victim's vehicle. Thirty minutes later, the defendant admitted to Richard that he had just shot the victim. The defendant then told Richard to go back to the vehicle. When Richard did, he saw the victim's dead body with a gunshot wound, which was consistent with how the defendant had admitted to killing him. The police also found the victim dead in his vehicle from a gunshot wound the next day. Forensic evidence

State *v.* Ayala

revealed that the victim was shot behind his right ear, which was consistent with Richard's testimony regarding the fact that the defendant was sitting in the rear of the vehicle on the passenger side of the car. Thus, Terror's statement that the defendant was the person who killed the victim was cumulative of Richard's other, unchallenged testimony that the defendant had admitted to killing the victim.

Additionally, testimony from another Piru gang member, Thomas, also corroborated the challenged testimony. Thomas testified that Terror and other gang members had held a meeting to address what to do with the victim, whom they believed betrayed the gang, and that Terror had ordered him to kill the victim. After Thomas refused to comply with Terror's order, the defendant volunteered to kill the victim. This testimony clearly demonstrates both the defendant's agreement to be part of the conspiracy and his intent to commit the murder. Thomas further testified that, during a conversation with the defendant about the victim on the day after the murder, the defendant told him that he felt badly about what he had to do but that Terror had ordered him to kill the victim.

Although this was not an ironclad case, it certainly was sufficiently strong, even without considering the challenged testimony, so that we have a fair assurance that admission of the challenged statements did not substantially affect the verdict. Indeed, two separate witnesses implicated the defendant as the killer, and, notably, one of them testified that the defendant had confessed to the crime minutes after he committed it. The other witness testified that the defendant, after killing the victim, said that he felt remorse for having done so. This remorse further established the defendant's own acknowledgment of his involvement in the killing. The evidence also showed that the defendant was sitting in the rear of the vehicle on the passenger

State *v.* Ayala

side and that the victim was shot behind his right ear. Therefore, this physical evidence demonstrated that the person who shot the victim was sitting in the seat in which the defendant sat. Thus, on the material points of whether the defendant committed the murder, Richard's testimony about Terror's statement was corroborated by other evidence.[6]

The defendant claims that Terror's statement was not corroborated by, or cumulative of, other evidence introduced by the state because the statement was the only evidence that described exactly *how* the murder occurred inside the victim's car. He argues that the remainder of Richard's testimony and the testimony of Thomas only described the fact that the murder occurred, not how it happened. We are unpersuaded by the defendant's argument.

As we already have explained, the defendant's agreement with Terror to commit the murder and the defendant's subsequent commission of that murder were already established by Thomas' testimony and Richard's other testimony. In this case, the precise details of how the murder occurred were not necessary to establishing either the identity of the killer or the elements of the crimes charged. Notwithstanding the dissent's wholesale attack on hearsay evidence in general, the defendant's admissions were competent, unchallenged evi-

---

[6] The dissent contends that the credibility of Thomas and Richards "was subject to significant challenge" and that Terror's statements were "critical corroboration" evidence that improperly bolstered their credibility. We disagree. Terror's statement was introduced through Richard. Terror did not testify. Therefore, if the jury believed Terror's statement, they must have found Richard credible in relaying it, and, therefore, it was not needed to bolster his testimony. Rather, if the statement regarding Terror was believed, it was because the jury found Richard credible on this point. As to Thomas, to the extent that Terror's statement could have bolstered the testimony of Thomas with respect to the fact that the defendant confessed to killing the victim, as we have explained in this opinion, Terror's statement was not critical but, instead, was simply cumulative of other evidence that corroborated that portion of Thomas' testimony.

State *v.* Ayala

dence before the jury. The challenged statements added very little, and, thus, we do not believe that the jury's verdict was substantially swayed by their admission. The other evidence already had established that the defendant had volunteered to kill the victim, had admitted to shooting the victim inside the victim's vehicle, and that the victim had been discovered by the police in his vehicle, dead from a gunshot wound. Certainly, on this record, even without Terror's statement that he handed the gun to the defendant inside the car, the identity of the killer and all of the elements of murder and conspiracy to commit murder were established.[7] We think it significant in evaluating harm to look to see how the state used this evidence in its closing argument. In doing so, we find it telling that the state did not specifically mention, and certainly did not emphasize, the challenged statement during its closing argument, thus diminishing the importance of the statement to the state's case.[8] See *State* v. *Thompson*, 266 Conn. 440, 456, 832 A.2d 626 (2003) (concluding that admission of challenged testimony was harmless error, in part, because state did not emphasize or rely on challenged testimony during closing argument). Rather, the state focused its argument on the other unchallenged evidence highlighted in this opinion. Stated succinctly, Terror's statement simply was not pivotal to the state's case.

[7] We note that part II B of the dissenting opinion recognizes and relies in its analysis upon the fact that Terror's statements offered very little new information in comparison to what Richard already knew, yet part I of the dissenting opinion asserts that Terror's statements "played a prominent part in the case against the defendant." We think that the dissent's characterization of Terror's statements as providing little additional information is correct and, thus, conclude that the admission of evidence regarding those statements was harmless.

[8] Although the state mentioned that the defendant killed the victim by "pointing a gun at the back of [the victim's] head and pulling the trigger and putting a bullet through the back of his skull," the state never attributed this evidence to Terror, and that evidence was also supported by the forensic evidence demonstrating that the victim was shot on the back, right side of the head.

State *v.* Ayala

The defendant also claims that the admission of Terror's statement was harmful because the state's case was weak.[9] In support of his claim, the defendant points to a lack of physical evidence connecting him to the murder. It is well established, however, that a lack of physical evidence does not necessarily equate to a weak case. See *State* v. *Fauci*, 282 Conn. 23, 53, 917 A.2d 978 (2007) (concluding that state's case was strong on basis of witness testimony despite lack of physical evidence linking defendant to crime). In the present case, although we acknowledge that there was no physical evidence linking the defendant to the murder and that physical evidence providing that link would have made the state's case stronger, the unchallenged testimonial evidence of Richard and Thomas demonstrated that the defendant agreed to kill the victim and later admitted to doing the same.

The defendant asserts that Richard's testimony was the only testimony that the jury believed, so any part of it that was improperly admitted could not be harmless. In support of his claim, the defendant points to the

[9] As one basis to support this claim, the defendant argues that the trial court's acquittal on the other related charges; see footnote 1 of this opinion; is an indication that the state's case was weak. The state, however, accurately points out that the trial court, in rejecting the defendant's posttrial motion for a judgment of acquittal, explained that "clearly, there was evidence that, if credited by the jury, [the defendant] was guilty of the two crimes for which he was found guilty. . . . There is nothing before [the court] that would indicate that the jury did anything other than conscientiously review the evidence and credit the testimony of . . . Thomas . . . and Richard, and [determine] that the state has proved [the defendant's] guilt beyond a reasonable doubt." For these reasons, we cannot conclude that the state's case was weak on the basis of the judgment of the trial court regarding the related charges.

The dissent also relies upon the trial court's acquittal in its analysis. We disagree that the trial court's view on separate charges that were part of a bench trial should be considered in our analysis of the issues in this case. The defendant exercised his constitutional right to have the jury be the ultimate fact finder in this case and, like the trial court correctly recognized, that is the fact finder to whose judgment we defer in evaluating the credibility of the state's witnesses.

State *v.* Ayala

fact that Richard's testimony and Thomas' testimony conflicted on the issue of whether the defendant was present at the meeting where he allegedly volunteered to kill the victim. As a result, the defendant claims that the jury had to believe either Richard's testimony in its entirety or Thomas' testimony in its entirety, but it could not believe both.[10] The defendant further reasons that, because the jury asked to have Richard's testimony read back but did not ask to have Thomas' testimony read back, it must have believed Richard's testimony in its entirety and rejected Thomas' testimony in its entirety.

Contrary to the defendant's contention, it is not accurate that the jury had only two choices: either entirely believe Richard or entirely believe Thomas. The jury did not have to believe either Richard's testimony or Thomas' testimony in its entirety. In fact, this court repeatedly has explained that "[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal

---

[10] As we explained previously in this opinion, Thomas testified that, on the day of the murder, he attended a meeting at Youmans' house and that, at that meeting, Terror ordered Thomas to kill the victim, Thomas refused, and the defendant volunteered to do it. Thomas also testified that this meeting took place "later on in the day." Thomas testified that he, Youmans, Terror, Richard, and the defendant were present at the meeting. Thomas further stated that "I believe there might have been more, but I just don't remember who."

Richard testified that, on the day of the murder, he attended a meeting at Youmans' house where the individuals present were "discussing" the victim. He further testified that the meeting took place at "10:30, 11 in the morning." He stated that he, Youmans, Terror, and "a couple of . . . other members" were present but that he could not "remember everybody's name who was there." He also stated that the defendant was not present.

At first glance, the testimony of Thomas and Richard regarding the meeting seem to conflict. We are, however, not convinced that their testimonies are irreconcilable. It is entirely possible that there were two meetings and Thomas could have been mistaken that Richard was present at the meeting he attended, particularly given his own admission that he could not remember everyone who was present at the meeting.

State *v.* Ayala

quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 223, 100 A.3d 821 (2014).[11] The jury could have believed portions of testimony from each of these two witnesses. Therefore, we cannot accept the defendant's claim that Thomas' testimony was wholly rejected by the jury and only Richard's testimony supported the jury's verdict. Instead, we conclude that the jury was free to believe those portions of each witness' testimony that it found credible. It is also clear to us that portions of both Thomas' and Richard's testimony supported the verdict.

In sum, even without considering Terror's statement regarding the details of what happened inside the victim's vehicle, the state's case consisted of testimony from two witnesses that not only corroborated, but also was cumulative of the challenged statement implicating the defendant as the killer. The defendant performed extensive cross-examinations of the state's witnesses highlighting inconsistencies in their testimony. The jury was free to make its credibility determination, and we do not second-guess that determination.[12]

---

[11] In the present case, the members of the jury were instructed in relevant part: "You are also not bound to accept a fact as true simply because a witness testifies to a fact and no one contradicts it. The credibility of the witness and the truth of the fact is for you to determine. You may disbelieve all or any part of a witness' testimony. . . . You should decide what portion, all, some, or none of a witness' testimony you will believe."

[12] The dissent asserts that, "[a]lthough for some issues raised on appeal, we must defer to the jury's credibility determinations, our cases make clear that we may consider witness credibility in a harmless error analysis," and cites several cases in support of that position. To the extent that the dissent asserts that we do not defer to the credibility determinations of the fact finder, we disagree and find the dissent's reliance on the cases misplaced. The cases cited by the dissent do not demonstrate that we do not defer to the fact finder's credibility determinations. Instead, the cases cited by the dissent address impeachment evidence of which the jury was unaware, not corroborating evidence. See *State* v. *Ritrovato*, 280 Conn. 36, 57–58, 905 A.2d 1079 (2006) (concluding that exclusion of impeachment evidence of alleged victim's prior sexual conduct rebutting her testimony that she was a virgin was not harmless error with respect to sexual assault charges); *State* v. *Cortes*, 276 Conn. 241, 885 A.2d 153 (2005) (concluding that exclusion

State *v.* Ayala

The dissent also asserts that "deference to the fact finder is most appropriate when an 'assessment of the credibility of the witnesses . . . is made on the basis of its firsthand observation of their conduct, demeanor and attitude.' . . . Here, however, the evidence undermining the witness' credibility—namely, various forms of self-interest, including the desire to lessen or eliminate their criminal liability—is apparent not from subjective firsthand observation, but objectively from the transcript and exhibits offered by the parties." (Citation omitted; emphasis omitted.) We disagree. It is axiomatic that "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our

of evidence of sexual relationship between complainant and defendant was not harmless error when presenting such evidence was "the most effective method of impeaching the state's witnesses"). Therefore, we find those cases to be inapposite.

In the present case, defense counsel performed extensive and thorough cross-examinations of Richard and Thomas, emphasizing for the jury the witnesses' potential biases and motivations for testifying. Unlike the juries in the cases cited by the dissent, the jury in the present case was fully informed and was not deprived of critical evidence regarding the witnesses' credibility.

The dissent relies on *Holmes* v. *South Carolina*, 547 U.S. 319, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), for the proposition that "where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact and that the South Carolina courts did not purport to make in this case." The principle annunciated in *Holmes* is not applicable here. *Holmes* does not involve a harmless error analysis.

In *Holmes*, the United States Supreme Court was examining South Carolina's evidentiary rule that evidence of third-party culpability may be ruled inadmissible at trial "where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence." Id., 324. The United States Supreme Court rejected South Carolina's evidentiary rule, in part, because it did not require the trial court to consider the credibility of the prosecution's witnesses or the reliability of its evidence before deciding whether to exclude third-party culpability evidence during the course of the trial, i.e. before a jury has made any credibility determinations itself. This is wholly different from allowing an appellate court to substitute its judgment for the fact finder after the fact finder has made its credibility determinations, which is what the dissent is suggesting we should do here.

State *v.* Ayala

feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude.'' (Internal quotation marks omitted.) *State* v. *Bush*, 325 Conn. 272, 304–305, 157 A.3d 586 (2017). Importantly, the jury heard and evaluated all of the objective evidence offered to impeach the witnesses. It also observed firsthand each of the witness' conduct, demeanor, and attitude upon being confronted with that impeachment evidence. The jury was free to make its credibility determination on the basis of what it heard in testimony and observed from watching the witnesses testify. The fact that the transcript and exhibits reveal biases and motives of the witnesses does not allow us to substitute our judgment of witness credibility for the jury's determination. As aptly stated by the trial court, ''[t]here is nothing before [the court] that would indicate that the jury did anything other than conscientiously review the evidence and credit the testimony of . . . Thomas . . . and Richard, and [determine] that the state has proved [the defendant's] guilt beyond a reasonable doubt.''

On the basis of the foregoing, even if we assume that the trial court incorrectly admitted the evidence under the coconspirator hearsay exception, the defendant has not met his burden of demonstrating that the admission of Richard's testimony regarding Terror's statement had a substantial impact on the jury's verdict. We conclude, therefore, that we have a fair assurance that, under the circumstances of this case, the jury's verdict was not substantially affected by any such error. Thus, the alleged error was harmless.

II

The defendant next claims that the trial court improperly admitted testimony of Tavaris Wylie regarding statements made to him by the victim in which the vic-

State *v.* Ayala

tim expressed fear of the gang. In particular, the defendant asserts that the trial court abused its discretion in admitting the victim's statements as state of mind evidence because they were irrelevant, misleading, and unfairly prejudicial.

The state counters that the trial court properly admitted the statements as evidence of the victim's state of mind. Specifically, it asserts that the victim's statements illustrated his deteriorating relationship with, and fear of, the Piru gang and, therefore, were relevant to the defendant's motive to kill the victim. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, the defendant filed a motion in limine seeking to preclude Wylie from testifying about statements made by the victim in which the victim expressed fear of the Piru gang. At the hearing on the motion, both the state and the defendant agreed that the state intended to introduce Wylie's testimony regarding the victim's statements to show that the victim was fearful of the gang.

The defendant argued that Wylie's testimony regarding the victim's fear of the Piru gang should be precluded on the basis that it was not relevant and that it was inadmissible hearsay. In response to that argument, the trial court remarked: "Well there's the state of mind exception, right? I mean that he's fearful, that's state of mind, right? But the state of mind only comes in if it's relevant." Rather than explain why the statements failed to satisfy the state of mind exception, or that the statements could not be considered admissible as nonhearsay,[13] the defendant focused his argument on challenging the relevance of the statements. He argued

_____

[13] We note that out-of-court statements demonstrating the defendant's state of mind can be admissible (1) as nonhearsay when they are not offered to prove the truth of the matter asserted; see *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000); or (2) under the state of mind exception to the hearsay rule. See *State* v. *Smith*, 275 Conn. 205, 219–20, 881 A.2d 160 (2005).

State *v.* Ayala

that the victim's fear of the gang was irrelevant and prejudicial because fear of the gang in general does not help to identify the defendant as the shooter.

After hearing the defendant's argument, the court asked the prosecutor if he wanted to be heard on the relevance issue. The prosecutor confirmed that he was offering Wylie's testimony as state of mind evidence— although he did not specify whether he was offering it as an exception to the hearsay rule or as nonhearsay— and that it was relevant because it demonstrated that the victim had specific concerns about the Piru gang, his relationship with the gang, and the gang's behaviors toward him.

The trial court ruled as follows: "Well, here's my ruling. You know, there's an interesting case, [*State* v. *Duntz*, 223 Conn. 207, 613 A.2d 224 (1992), in which] the Supreme Court ruled it inadmissible, the statement of a victim, that—I think it was a woman—that she feared the defendant, and that, without more, isn't probative of—or isn't relevant and isn't probative of anything. But then there's a subsequent case, [*State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005)] while recognizing *Duntz*, distinguished it in that case, because . . . the statements regarding fear were circumstantial evidence of a deteriorating relationship. I think that's similar here. I think it's relevant for two reasons. One, is it potentially corroborates . . . Thomas' testimony that he told [the victim] that the gang was going to kill him, and, secondly, it shows the nature of the—or is probative of the nature of the deteriorating relationship between [the victim] and the gang. The state's claim here is the gang ordered this hit. So his relationship with the gang is certainly relevant, and whether it was deteriorating is certainly relevant, and his fear of the gang is evidence of that. So, for those reasons, the motion in limine is denied."

Wylie proceeded to testify that, on the night of the victim's death, he had a conversation with the victim

State *v.* Ayala

during which the victim expressed his fear of the Piru gang. Wylie stated that he and the victim were discussing the gang when the victim said that he "just had a funny vibe about everybody." He further stated that the victim "felt like they [were] rocking him to sleep." Wylie explained that "rocking him to sleep" meant that they were "sheep in wool's clothing"[14] and that they were "coming for you." The defendant declined to cross-examine Wylie.

We begin by setting forth the standard of review and legal principles applicable to this claim. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary." *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007). "We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . [O]nly after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citation omitted.) Id.

"It is axiomatic that [if premised on a correct view of the law, the] trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's

—————

[14] Presumably, Wylie meant that the gang members were "wolves in sheep's clothing."

State *v.* Ayala

ruling, and we will upset that ruling only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009).

In the present case, the trial court did not clearly specify whether it was admitting Wylie's testimony regarding the victim's statements of fear as hearsay satisfying the state of mind exception or as nonhearsay. In the trial court, neither the state nor the defendant challenged the trial court's legal determination regarding whether the statements satisfied the state of mind exception to the hearsay rule or were nonhearsay but, instead, focused on relevancy and prejudice.[15] Accord-

---

[15] Although the defendant refers to the victim's statements as inadmissible hearsay in his brief, he does not assert that the trial court made an incorrect legal determination that they fit within the state of mind exception to the hearsay rule or were nonhearsay. For its part, the state, although it asserts that the statements were nonhearsay, does not engage in an analysis of the trial court's legal determination because, as the state points out, the defendant has not argued that the court had an incorrect view of the law. The defendant focuses solely on whether the trial court abused its discretion in admitting the statements because they were not relevant and were unduly prejudicial given that the victim's fear was of the gang generally and not of him specifically. Accordingly, because the defendant does not adequately challenge whether the trial court's decision was premised on a correct view of the law, i.e., whether the statements were hearsay but satisfied the state of mind exception or were nonhearsay, we need not review that issue.

Therefore, our examination—like the parties' briefs—focuses on whether the trial court abused its discretion in determining that the statements were relevant. The relevancy determination is the same regardless of whether statements of the victim's fear of the defendant were admitted under the state of mind exception to the hearsay rule or as nonhearsay. Compare *State* v. *Smith*, 275 Conn. 205, 217–20, 881 A.2d 160 (2005) (concluding that statements of victim's fear of defendant admitted under state of mind exception to hearsay rule are relevant to issues of defendant's motive and intent where there was corroborative evidence of victim's fear), and *State* v. *Duntz*, supra, 223 Conn. 233 (concluding that hearsay statements regarding victim's state of mind were not relevant to defendant's motive to kill victim where there was no corroborative evidence of victim's fear), with *State* v. *Patterson*, supra, 276 Conn. 487 (concluding that nonhearsay statements regarding victim's state of mind were relevant to defendant's motive to kill victim where there was corroborative evidence of victim's fear), and *State* v. *Wargo*, 255 Conn. 113, 138–40, 139, 763 A.2d 1 (2000) (concluding that nonhearsay statements regarding victim's state of mind were relevant to establish defendant's motive to kill where there was corroborative evidence of victim's fear).

State *v.* Ayala

ingly, we do not address the trial court's legal determination but examine only whether the trial court abused its discretion in determining that these statements were relevant.

"Evidence is relevant only if it has some tendency to establish the existence of a material fact." (Internal quotation marks omitted.) *State* v. *Duntz*, supra, 223 Conn. 233. "Whether the victim's state of mind is relevant depends . . . on the nature of the issues at trial. . . . We previously have held that evidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 485–86; see also *State* v. *Hull*, 210 Conn. 481, 502, 556 A.2d 154 (1989) ("[t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime").

In order for a victim's fear of the defendant to be relevant to motive, the state must demonstrate (1) a preexisting relationship between the victim and the defendant, and (2) independent evidence corroborating the victim's fear. As to the first requirement, "[i]t is well established in our jurisprudence that, where a marital or romantic relationship existed between a homicide victim and the defendant, evidence of the victim's fear of the defendant suggests a deterioration of that relationship, which is relevant to the issues of motive and intent. . . . This view finds support in the case law of multiple jurisdictions as well as common experience." (Citations omitted.) *State* v. *Smith*, 275 Conn. 205, 217, 881 A.2d 160 (2005). We have also applied this rule, however, to encompass other preexisting relationships between the victim and the defendant that are not marital or romantic in nature. See *State* v. *Patterson*, supra, 276 Conn. 485–86 (concluding that trial court did not abuse its discretion by admitting evidence of victim's fear of group of people that included defendant to dem-

State *v.* Ayala

onstrate motive); cf. E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.16.2 (b), p. 561 (cautioning that, "[u]nless there was a [preexisting] relationship . . . between the declarant and the defendant, bald statements that the declarant feared the defendant should not be admitted to prove the defendant was the cause of that fear").

With respect to the second requirement, this court also consistently has required that the state present independent evidence of the victim's fear in order for a victim's out-of-court statement of fear to be admissible. For instance, in *State* v. *Duntz*, supra, 223 Conn. 233, this court concluded that the trial court had abused its discretion in admitting statements of the victim's fear of the defendant to establish the defendant's motive when the only evidence of the victim's fear was the victim's uncorroborated statements to other people that he was in fear. In *Duntz*, the state asserted that the victim's alleged fear of the defendant was relevant because it showed that the victim and the defendant did not have a good relationship which, in turn, showed that the defendant had a motive to kill the victim. Id.

This court explained that "the jury could not have drawn such an inference *solely from the statements of the victim* without resorting to impermissible speculation. Indeed, the victim's expressed fear may have been subjective and unfounded. Particularly in view of the tremendous potential for this evidence of subjective fear to prejudice the defendant unfairly, we conclude that it was not admissible under the state of mind exception to the hearsay rule." (Emphasis added.) Id.

Subsequently, in *State* v. *Patterson*, supra, 276 Conn. 487, this court concluded that the trial court did not abuse its discretion in admitting out-of-court statements of the victim's fear of the defendant. Unlike in *Duntz*, however, in *Patterson*, there was independent evidence corroborating the victim's fear in the form of testimony

State *v.* Ayala

from another witness about the deteriorating relationship between the victim and the defendant. Id. On that basis, this court distinguished *Duntz* and explained that, ''in light of . . . corroborative testimony, the trial court reasonably determined that [the witness'] testimony regarding the victim's state of mind shortly before his death was probative of the defendant's motive to kill the victim.'' Id. This court further explained that, because of the independent evidence, ''the jury was not required to draw an inference of motive solely on the basis of the victim's uncorroborated statement.'' Id.; see also *State* v. *Wargo*, 255 Conn. 113, 139, 763 A.2d 1 (2000) (''[T]he state adduced ample evidence tending to show that the defendant had decided to kill the victim because he was extremely angry and upset that she had intended to divorce him and that, consequently, his contact with his children would be limited. We, therefore, conclude that the trial court did not abuse its discretion in determining that the testimony evidencing the victim's state of mind was relevant to establish, circumstantially, the extent to which the defendant's marriage had broken down, a state of affairs that the jury reasonably could have determined provided the defendant with a motive to kill the victim.'' [Footnote omitted.]).

Accordingly, in order to determine whether the trial court abused its discretion in determining that the victim's statements expressing fear of the gang, and thereby the defendant, were relevant, we must consider whether the state demonstrated that the defendant and the victim had a preexisting relationship and whether the state presented independent evidence to corroborate the victim's fear.[16] We conclude that it has.

---

[16] In the present case, the defendant does not challenge whether the state has demonstrated that he and the victim had a preexisting relationship. The evidence established that the defendant and the victim were closely connected through their membership in the Piru gang.

State *v.* Ayala

This case is controlled by our decision in *State* v. *Patterson*, supra, 276 Conn. 484–89. In *Patterson*, the defendant challenged the trial court's admission of testimony regarding certain statements made by the victim shortly before his death in which he expressed fear of a group of people that he knew. Id., 484. The defendant was a part of that group. The victim believed that this group was blaming him for shooting their mutual friend, Aki Johnson. Id., 455, 484–85. The victim's statement that was at issue was " 'they're trying to put this thing about [Johnson] on [me].' " Id., 456. The defendant argued that the victim's statement was vague and ambiguous with respect to the identity of those who, in the victim's view, blamed him for shooting Johnson. Id., 487. This court concluded that the victim's statement of fear was relevant because the state had presented independent evidence in the form of testimony of another witness corroborating the victim's fear. Id. Specifically, in *Patterson*, the state presented another witness who testified that the group, which included the defendant, had blamed the victim for shooting Johnson and that the defendant had killed the victim in retaliation for that shooting. Id.

Consequently, this court concluded that the jury was not required to draw an inference of motive solely on the basis of the victim's uncorroborated statement because the victim's fear was corroborated by other, independent evidence. Id. Accordingly, this court concluded that the trial court had not abused its discretion in finding that the state of mind evidence of the victim's fear was relevant because the jury could infer the defendant's motive, without impermissible speculation. Id. This court also concluded that, even though the victim did not specifically identify the defendant as one of the persons who harbored the belief that the victim had shot Johnson, his reference to the group of people, which included the defendant, who harbored that belief,

State *v.* Ayala

was a sufficient link between the victim's statement and the defendant to warrant the admissibility of the victim's statement. Id.

We find *Patterson* particularly instructive on two points. First, *Patterson* teaches that the victim's statements reflecting fear of the defendant will be considered sufficiently probative if the state presents corroborating evidence of that fear.

In the present case, the state presented independent corroborating evidence of the victim's fear and the defendant's motive to kill the victim. In particular, starting with the evidence of a deteriorated relationship, Richard testified that members of the Piru gang felt the victim had disrespected them because they believed that he was planning on switching to a different gang. Thomas also testified that he knew that there were issues between members of the Piru gang and the victim. Thomas further testified that Terror had said that he wanted the victim "taken care of" and that the defendant then volunteered to kill the victim. From this testimony, which was independent and corroborative of the victim's statements to Wylie, the jury could infer that the victim's relationship with the gang had deteriorated and, thus, the defendant had a motive to kill the victim.

Furthermore, Thomas testified about the hierarchical structure of the Piru gang and how lower gang members, like the defendant and Thomas, were expected to rise up in the ranks. Indeed, the testimony offered at trial indicates that following orders to kill was a way to rise up in the ranks. Thomas also stated that, shortly after the defendant volunteered to kill the victim, Thomas made the victim aware of the threat that had been made on his life. Accordingly, we conclude that, as in *Patterson*, the existence of independent, corroborating evidence allowed the jury in the present case to

State *v.* Ayala

infer motive from the victim's expression of fear without resorting to impermissible speculation.

Second, *Patterson* also instructs that the victim's statement of fear of the group, of which the defendant was a member, was admissible even though the victim did not identify the defendant specifically. In the present case, the victim's statement of fear related to a group to which the defendant belonged, although he did not identify the defendant specifically. The evidence demonstrated that the leader of the gang wanted the victim dead and that the defendant was not only a member of the gang but also had volunteered to commit the killing. We conclude, consistent with *Patterson*, that the victim's statement of fear of the Piru gang provided a sufficient link to the defendant to warrant the admissibility of the victim's statements.

The defendant asserts that the trial court abused its discretion in admitting the statements regarding the victim's fear of the Piru gang because the victim's state of mind was not relevant. He argues that the victim's state of mind was not relevant because (1) Thomas' testimony was not corroborative because the defendant asserts that Thomas' testimony was not credible and did not identify the defendant as the person the victim feared, and, relatedly, (2) the actual statement of the victim's fear itself did not address the victim's relationship with the defendant specifically but only related to the gang as a whole. In support of his claim, the defendant relies on *State* v. *Duntz*, supra, 223 Conn. 232–33. Specifically, the defendant asserts that *Duntz*, rather than *Patterson*, controls the outcome of the present case. We disagree.

In *Duntz*, this court concluded that statements by a victim regarding his fear of the defendant were inadmissible as state of mind evidence because the state presented no other evidence indicating that the victim and

the defendant had an antagonistic relationship. Id., 233. This court explained that "the jury could not have drawn such an inference [that an antagonistic relationship and, hence, a motive existed] solely from the statements of the victim without resorting to impermissible speculation." Id. The sole evidence of motive was the victim's expressions of fear.

Neither of the defendant's arguments has merit. The present case does not involve a situation in which the victim's expressions of fear constituted the only evidence of his deteriorating relationship with the gang and, therefore, motive. To the contrary, the testimony of Thomas that the leader of the gang wanted him dead and that the defendant had volunteered to kill him is independent evidence corroborating the victim's fear. That type of evidence did not exist in *Duntz*. Thus, we find *Duntz* inapplicable to the present case.

Additionally, the defendant's argument that Thomas' testimony is not corroborative because it does not specifically identify the defendant as the person the victim fears must also fail. Again, as we pointed out in *Patterson*, fear of a group that includes the defendant may serve as a sufficient link even if the victim does not identify the defendant specifically. See *State* v. *Patterson*, supra, 276 Conn. 487. Because there was sufficient, independent evidence corroborative of the defendant's fear, we conclude that *Patterson* controls the outcome of this case, not *Duntz*.

To the extent that the defendant asserts that there is no corroborating evidence in the present case because Thomas' testimony was not credible, we cannot review that claim. As we have explained previously in this opinion, "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the

State *v.* Ayala

witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude.'' (Internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 223. It is not our role to question whether the jury believed Thomas' testimony. The fact is that, if believed, Thomas' testimony provided independent evidence corroborating the victim's fear of the gang. Our inquiry must end there.

The defendant finally argues that the trial court abused its discretion in admitting the state of mind evidence because the evidence was unduly prejudicial. We disagree. As this court recognized in *State* v. *Duntz*, supra, 223 Conn. 233, state of mind evidence has the potential to unfairly prejudice a defendant. Nevertheless, this court consistently has concluded that a trial court does not abuse its discretion when it admits state of mind evidence of the victim's fear as long as the state has demonstrated a preexisting relationship between the defendant and the victim and has produced independent, corroborating evidence of the victim's fear. As we have explained in this opinion, in the present case, the state both demonstrated a preexisting relationship between the victim and the defendant and produced independent evidence to corroborate the victim's fear.

Accordingly, we conclude that the trial court did not abuse its discretion in determining that the victim's state of mind was relevant as evidence of the deteriorating nature of his relationship with the Piru gang from which the jury could reasonably infer the defendant's motive to kill him.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and KAHN, Js., concurred.

D'AURIA, J., with whom PALMER and ECKER, Js., join, dissenting. Lawyers learn early in law school what

State *v.* Ayala

we all know instinctively to be true: conclusions built on hearsay can be inherently unreliable and unfair. When a witness testifies to what another has said—unsworn and out of court—there is a heightened potential that the evidence is inaccurate, fabricated or lacking context. In criminal cases particularly, when the out-of-court declarant is unavailable for cross-examination, admitting certain hearsay testimony against a defendant can render the trial constitutionally infirm. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (sixth amendment confrontation clause bars admission of testimonial hearsay against criminal defendant unless defendant had prior opportunity for cross-examination and witness is unavailable); see also *Michigan* v. *Bryant*, 562 U.S. 344, 370 n.13, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (due process clauses of fifth and fourteenth amendments may bar admission of "unreliable evidence").

As a general matter, then, in pursuit of their truth-seeking function, courts do not permit hearsay. See Conn. Code Evid. § 8-2. Under certain circumstances, however, and also in pursuit of the truth-seeking function, our evidence code makes exceptions to this general rule and permits courts to admit hearsay. These exceptions are most often justified when the statements at issue were made "under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination." *Chambers* v. *Mississippi*, 410 U.S. 284, 299, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).[1]

---

[1] In some instances, courts have made exceptions because the hearsay declarant was a party and, under our adversary system, "it was thought that a party could not complain of the deprivation of the right to cross-examine himself (or another authorized to speak for him) or to advocate his own, or his agent's, untrustworthiness." *Bourjaily* v. *United States*, 483 U.S. 171, 190, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (Blackmun, J., dissenting). Although such exceptions generally do not require an independent showing of reliability; e.g., Fed. R. Evid. 801, advisory committee notes, 28 U.S.C. app., p. 1063 ("[n]o guarantee of trustworthiness is required in the case of an admission"); they nonetheless are justified, at least in part, by their

State *v.* Ayala

In the present case, both the victim, Thomas L. Mozell, Jr., and the defendant, Vincente Ayala, were members of a street gang known as Piru, which had a presence in the New Haven area. No physical evidence or firsthand eyewitness evidence linked the defendant to the victim's murder in 2012. It is therefore no understatement to say that *all* of the pertinent testimony identifying the defendant as the murderer was either hearsay or hearsay statements ostensibly offered to prove something other than the truth of the matter asserted. Moreover, each of the hearsay statements was testified to by two other gang members, Timothy Thomas and Jordan Richard, whom the trial court determined were "significantly compromised individuals" who provided "extremely limited and self-serving" testimony. None of this testimony was corroborated by anything other than more hearsay. In the trial court's words, there was a "complete lack of any evidence supporting" their claims. In my view, these are hardly "circumstances that tend to assure reliability . . . ." *Chambers* v. *Mississippi*, supra, 410 U.S. 299.

At issue in this appeal is a particular hearsay statement delivered to the court through Richard, in which one of the gang's leaders, known as "Terror," claimed to have seen the defendant shoot the victim. The trial court admitted the statement under the coconspirator exception to the rule against hearsay. See Conn. Code Evid. § 8-3 (1) (E). The majority assumes that this was error but concludes that it was not harmful.

Given the scant evidence in this case, including the state's heavy reliance on uncorroborated hearsay that came into evidence through witnesses the trial court found to be unreliable, I am left without "a fair assurance" that the admission of the coconspirator evidence "did not substantially affect the verdict." *State* v. *Favoc-*

supposed trustworthiness. See 4 C. Mueller & L. Kirkpatrick, Federal Evidence (4th Ed. 2019) § 8:44 ("important is the fact that the party himself is present and can explain, deny, or rebut any such statement").

State *v.* Ayala

*cia*, 306 Conn. 770, 808, 51 A.3d 1002 (2012). I must
therefore confront the question of whether the trial
court erroneously admitted Terror's statement, as the
majority assumes. I conclude it did because there is
a lack of evidence that the statement was made "in
furtherance" of an ongoing conspiracy, as required by
the coconspirator exception. I would therefore reverse
the trial court's judgment. Accordingly, I respectfully
dissent.[2]

[2] I ask the reader to forgive my reversal of the usual order in opinion
writing. Because the majority affirms the judgment of conviction on the
coconspirator issue by assuming error and finding harmlessness, I meet the
majority on its terms by addressing harm first. Because I conclude that the
trial court erroneously admitted the coconspirator evidence and that this
error was harmful, I do not reach the question of whether the trial court
abused its discretion in admitting, under the state of mind exception to the
hearsay rule, the victim's statement to his friend, Tavaris Wylie, that he
feared Piru. See part I A of this dissenting opinion. I note, however, that this
court and other courts have traditionally viewed such statements skeptically.
See, e.g., *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005). In my
view, the facts of this case provide even more reason to doubt the worth
of the victim's hearsay. Therefore, in considering the strength of the state's
case, I consider the victim's statement to be of limited value as proof of
the defendant's motive to murder him.

The theory of admissibility in this context reasons that a victim's statement
of fear of a defendant is evidence that their relationship is collapsing. If the
jury infers that their relationship is indeed collapsing, it may further infer
that the defendant is so affected by the collapse that he has a plausible
motive to commit murder. See, e.g., *State* v. *Thomas*, 205 Conn. 279, 285,
533 A.2d 553 (1987) ("the purpose of the evidence was to show that the
relationship had broken down, and that . . . the victim's estrangement from
the defendant supplied the motive for him to commit murder"). A jury is
likely to misunderstand or go beyond this permissible inference. See E.
Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.16.2,
p. 560 ("[t]he failure to connect a declarant's subjective state of mind to
the issues in the case is not an uncommon error in logical analysis"); see
also 2 K. Broun, McCormick on Evidence (7th Ed. 2013) § 276, pp. 401–402
("the most likely inference that jurors may draw from the existence of fear,
and often the only logical inference that could be drawn, is that some
conduct of the defendant, probably mistreatment or threats, occurred and
caused the fear"). We have also recognized "the heightened potential for
prejudice in cases such as this," in which we "[allow] surrogates to speak
for the victim pointing back from the grave." (Internal quotation marks
omitted.) *State* v. *Smith*, supra, 275 Conn. 218.

In this case, any inference connecting the victim's statement of fear to
the defendant is particularly tenuous. We know almost nothing about the
nature of the relationship between the victim and the defendant other than

State *v.* Ayala

I

Clearly, someone in the Piru gang wanted the victim dead. He was believed to be thinking of leaving the Piru gang to join another gang and would perhaps retaliate against Piru. The main question at trial was which Piru member carried out the victim's murder. I have no disagreement with the majority's recitation of facts that the jury could have reasonably found to be true. I simply summarize them here to explain why I cannot agree with the majority that the state's case was "sufficiently strong" so as to leave me with a fair assurance that admission of the challenged statements did not substantially affect the verdict. In light of this conclusion, I further explain why I do not find the defendant's claim of error harmless, if indeed it was error.

A

The victim apparently knew he was not in good standing with Piru. We know this from a statement he supposedly made to his friend, Tavaris Wylie, on the night of the murder. Wylie testified that the victim told him he had a "funny vibe about everybody" in the gang; he "felt like they was rocking him to sleep"; acting like "a sheep in [wolf's] clothing"; and that he had to "[w]atch [his] back" because "[t]hey was playing [him]" and "[c]oming for [him]." Although the victim expressed that he had this "vibe" about everybody in the gang, never mentioning the defendant individually, the defendant was the only one on trial. As many as forty members of Piru were in the New Haven area at that time, however. The trial court nonetheless determined that

that they were members of the same gang. Moreover, because the victim had no apparent reason to fear the defendant specifically, the victim's statement—that he feared "everybody" in the gang—was equally applicable to all forty members of Piru in New Haven at that time. Thus, although I do not reach the question of whether the trial court abused its discretion in admitting the statement, in assessing the strength of the state's case, I believe it does little to prove that the defendant had a motive to murder the victim.

State *v.* Ayala

Wylie's testimony was relevant to establish the defendant's motive to kill the victim and admitted it into evidence under either the state of mind exception to the hearsay rule or as nonhearsay. See Conn. Code Evid. §§ 8-3 (4) and 8-1 (1). The defendant has challenged this ruling on appeal. See part II of the majority opinion.

The victim's fear of the gang appears to have been well founded. We know this because Terror apparently had ordered him murdered. Terror did not testify, and we know virtually nothing about him other than that he was a leader of an out-of-state faction of the Piru gang. And yet, despite this detachment, what Terror supposedly said both before and after the murder—namely, his order that the victim be murdered and his statement recounting how the murder happened—played a prominent part in the case against the defendant. In particular, Terror's purported description of how the murder occurred was the only eyewitness evidence of the killing. No testifying witness saw the murder, nor could a testifying witness say the defendant committed it, without relying on the alleged admissions from the defendant himself. Terror's description of the killing is unquestionably at issue in this appeal.

Thomas testified that Terror had initially ordered him to kill the victim. This hearsay statement was admitted under either the coconspirator exception to the hearsay rule or as nonhearsay, and its admissibility is not challenged on appeal. See Conn. Code Evid. §§ 8-3 (1) (E) and 8-1 (1). Thomas refused the order because the victim was a close friend. According to Thomas, the defendant then volunteered to carry out the murder. This hearsay statement is an admission by the defendant, and its admissibility is not challenged on appeal. See Conn. Code Evid. § 8-3 (1) (A). Later that evening, Thomas claimed, he warned the victim that the gang posed a threat to his life, although he did not mention the defendant specifically.

State *v.* Ayala

The police found the victim dead in his vehicle the next morning, a bullet to the back of his head. There seems little doubt that someone in the gang committed the murder, but because none of the testifying witnesses claimed to have seen the shooting, it is less clear which gang member pulled the trigger.

Richard gave the most contemporaneous firsthand testimony, although he claimed to have no personal knowledge as to who shot the victim. He testified that on the evening of the murder, the victim sat in the driver's seat of his vehicle smoking marijuana with Terror, Richard and one other gang member, Montese Gilliams. Richard claimed that the defendant then showed up and entered the vehicle. At that point, Richard said, the other occupants all told him to leave, which he did.

No one who remained in the vehicle testified at trial. Rather, the evidence that it was the defendant who killed the victim came in the form of three other hearsay statements. The first two statements allegedly came from the defendant. Years after the murder, when Thomas and Richard faced unrelated criminal charges, each pointed the finger at the defendant. Both testified that the defendant had admitted to them that he had shot the victim. Richard said that the defendant had confessed on the night of the murder that he had shot the victim. Thomas said that the defendant had told him the next day that he felt badly about killing the victim but that Terror had ordered him to do so. These hearsay statements are also party admissions and are not challenged on appeal. See Conn. Code Evid. § 8-3 (1) (A).

The third statement is the subject of this appeal. It allegedly came from Terror, a leader of the New York faction of the gang. Richard testified that he and Terror went to the home of Terror's mother in the Bronx, New York, the day after the murder and remained there for about one week. At some point while they were in New

State *v.* Ayala

York, Richard claimed, Terror described to him how the defendant had murdered the victim: "[Terror] told me that all four of them were in the car smoking. . . . And in the midst of, you know, the joint being passed around, he somehow handed [the defendant] the weapon, and the entire time while [the defendant] is, you know, playing with the—you know, fixing the gun, cocking it back or whatever, Terror is blocking [the defendant] so [the victim] can't see him in the rearview mirror, and Terror sat—[a]fter that, Terror sat back, he looked at [the defendant], and he fired." The trial court admitted Terror's hearsay statement, over the defendant's objection, under the coconspirator exception to the hearsay rule. See Conn. Code Evid. § 8-3 (1) (E).

The state's case against the defendant can therefore, I believe, be fairly summarized as follows: The victim said that he feared the entire gang. Members of that gang, who were themselves involved in the victim's murder, then blamed the defendant for the murder via hearsay statements. One gang member (Thomas) testified that the defendant agreed to kill the victim. Two gang members (Thomas and Richard) claimed the defendant admitted that he killed the victim. And a leader of the gang (Terror) told the second gang member (Richard) how the defendant had killed the victim. This evidence was perhaps sufficient to convict the defendant.[3] But in a case in which every member of the Piru gang—including everyone who was in the vehicle with the victim that night—had the same motive (to carry out the gang leader's order), in my view, the evidence was hardly overwhelming.

I am not the only one who thinks so. The defendant was acquitted of the charges of carrying a pistol without a permit and criminal possession of a firearm, which

---

[3] On appeal, the defendant does not challenge the sufficiency of the evidence to convict him.

State *v.* Ayala

he elected to have tried to the court. Although these charges differ from those the jury considered, the court's finding turned on precisely the same factual issue. As the court stated: "The only real issue in the dispute before me is whether the defendant shot [the victim] on March 16, 2012, and therefore was carrying and possessing a pistol when he did so." The court explained that the "evidence against the defendant rested primarily on the testimony of two witnesses," Thomas and Richard, "significantly compromised individuals" who gave testimony that was "extremely limited and self-serving." The court further stated: "The testimony of the two gang members [Thomas and Richard] who had pointed the finger at the defendant—that testimony was simply unconvincing to me." In light of the "complete lack of any evidence supporting" their claims, the court concluded: "After considering all the evidence, and most importantly in this case the lack of evidence, I am left with an honest and reasonable uncertainty in my mind that the defendant sat in the backseat of the victim's motor vehicle, held a pistol in his hand, and shot [the victim]."

In ruling on the defendant's postverdict motion for a judgment of acquittal on the jury's guilty verdict on the charges of murder and conspiracy to commit murder, the trial court appropriately observed that it could not substitute its assessment of the witnesses' credibility for that of the jury and therefore denied the motion, notwithstanding that the jury verdict was inconsistent with its own finding on the weapons charges. But the trial court sat through the trial and observed the witnesses, and, therefore, in my view, its assessment of the evidence should not be discounted in assessing the strength of the state's case without Terror's statement. E.g., *State* v. *Kendrick*, 314 Conn. 212, 223, 100 A.3d 821 (2014) (deference to fact finder appropriate when "assessment of the credibility of the witnesses . . . is

State *v.* Ayala

made on the basis of its firsthand observation of their conduct, demeanor and attitude'' [internal quotation marks omitted]).

The majority apparently believes that in evaluating the strength of the state's case for harmless error purposes we must ignore this inconsistent verdict. I acknowledge that in evaluating the strength of the case, we must begin with the assumption that the jury found the state's witnesses credible, which the trial court did not. I further acknowledge the unique challenge of evaluating the ''strength'' of the state's case when the jury has found the defendant guilty beyond a reasonable doubt. Viewed in this light, *all* cases on appeal are strong cases. The question we confront—as required by our case law—is whether the case was strong enough to survive the removal of the contested evidence, which the majority assumes—and I conclude—to have been erroneously admitted. See *State* v. *Favoccia*, supra, 306 Conn. 809 ('' 'overall strength of the prosecution's case' '' among several factors considered in evaluating harmfulness). On the basis of my own review of the tenuous record of hearsay evidence in this case, including the fact that no forensic evidence implicated the defendant, that there was no firsthand testimony of any eyewitness who saw the shooting, and no other circumstantial evidence of any kind, I have no trouble concluding that this was not a strong case, notwithstanding that the jury returned a verdict against the defendant. And its strength would have diminished with the removal of the Terror statement, which, in addition to being the only evidence of a purported eyewitness who claimed the defendant committed the murder, served to corroborate the other hearsay that remained in this case. The majority will admit only that the case against the defendant was not ''ironclad . . . .'' Although the different conclusions reached by different fact finders is not dispositive to me in light of my own independent evalua-

State *v.* Ayala

tion, I can think of no better, objective example of a "close case"—and therefore, in my view, not a strong one—than a case in which two fact finders come to different conclusions, particularly where one of them found the state's main witnesses "simply unconvincing . . . ." I cannot agree with the majority that the state's case can objectively be described as strong, even when considering *all* of the evidence, let alone if Terror's statement to Richard is excluded.

B

The majority assumes error in the admission of Terror's out-of-court statement to Richard under the coconspirator exception to the hearsay rule; see Conn. Code Evid. § 8-3 (1) (E); but proceeds to find that the defendant has not carried his burden of proving that this error harmed him. In large part because I disagree with the majority that the state's case was sufficiently strong, I disagree with the majority's conclusion on harm.

An evidentiary error is harmless only "when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 306 Conn. 809. In searching for this fair assurance, we consider several factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) Id.

"Perhaps the single most significant factor in weighing whether an error was harmful . . . is the strength of the case against the defendant. . . . [A] court should be especially loath to regard any error as harmless in a close case, since even the smallest error may have

State *v.* Ayala

been enough to tilt the balance in favor of a conviction.''
3B C. Wright et al., Federal Practice and Procedure
(4th Ed. 2019) § 854. For reasons previously detailed,
I believe that, at best, this was a ''close case.'' Four
points persuade me that if Terror's out-of-court state-
ment to Richard was erroneously admitted, the defen-
dant has shown that its inclusion was harmful: the
absence of physical or eyewitness evidence corroborat-
ing the testimony of both key witnesses; the state's
admitted reliance on unreliable witnesses; the fact that
Terror's statement was not entirely cumulative of other
evidence; and the fact that the declarant was not subject
to cross-examination.

First, no physical evidence connected the defen dant
to the crime scene. Neither the defendant's finger-
prints nor his DNA were found on or near the vehicle.
Although ''the absence of conclusive physical evidence
. . . does not automatically render [the state's] case
weak, that same absence surely does not strengthen
the state's case against the defendant.'' *State* v. *Ceballos*,
266 Conn. 364, 416, 832 A.2d 14 (2003).

Physical evidence did, however, tie Richard to the
crime scene. The police found Richard's fingerprint on
the vehicle's rear right interior door handle—the handle
next to the seat the shooter occupied. In fact, this
evidence helped establish a sufficient connection to
Richard as the culprit that the trial court permitted
the defendant to make a third-party culpability argu-
ment and instructed the jury on that theory. To war-
rant a third-party culpability instruction, the evidence
must ''*directly* [connect] the third party to the crime.''
(Emphasis in original; internal quotation marks omit-
ted.) *State* v. *Francis*, 267 Conn. 162, 174, 836 A.2d
1191 (2003). This is a ''high standard.'' Id., 175; see also
*Johnson* v. *Commissioner of Correction*, 330 Conn. 520,
564, 198 A.3d 52 (2019) (''proffered evidence [of third-
party culpability] [must] establish a direct connection to

State *v.* Ayala

a third party, rather than raise merely a bare suspicion'' [internal quotation marks omitted]).

According to the trial court, "a wealth" of evidence pointed to Richard. Apart from his fingerprint being found next to the shooter's seat, Richard's presence in the vehicle on the night of the murder and his membership in Piru meant he had the same opportunity and motive to kill the victim as the defendant did. Richard also tampered with evidence when he removed a cell phone from the victim's vehicle and destroyed it,[4] fled to New York after the murder, where he remained for one week, and lied to the police for several years about his involvement in the incident.

In evaluating the strength of the state's case, I simply do not find it impressive that Richard was able to deliver testimony consistent with Terror's hearsay and the testimony of the prosecution's forensics expert, James R. Gill, the state's chief medical examiner. Specifically, the majority finds it remarkable that Richard was able to place the defendant in the very seat in the car where, according to the expert's testimony, the killer must have sat when he fired the fatal gunshot. But if Richard were the killer—and a wealth of evidence suggested he was—

[4] Even Richard's explanation about retrieving the cell phone raised questions. Specifically, he testified that about thirty minutes after he heard a gunshot, he met up with the defendant at the home of Davon Youmans, another Piru member. According to Richard, the defendant claimed to have left his cell phone in the victim's car and asked Richard to get it for him. Richard went to the car, saw the victim, and removed a cell phone from the center console. On his way back to the house, he realized that he mistakenly had taken the victim's phone from the car and therefore destroyed it. When Richard arrived back at the house, the defendant was gone. The idea that Richard would not only risk going to the crime scene, but also would get into the vehicle, seems highly counterintuitive because he could not know when the police might arrive. Nor did Richard explain how he later realized he had taken the wrong phone, why the defendant had left the house without his phone without waiting for Richard to return, or, most notably, why the police never found the defendant's phone in the victim's car. The questionable nature of this testimony not only diminished Richard's credibility, but it also supported the defendant's third-party culpability defense by insinuating that Richard had fabricated this testimony in order to inculpate the defendant and exculpate himself.

State *v.* Ayala

of course he would know where the killer was sitting! He was in that very seat, by his own admission. His testimony would have been more remarkable if anyone besides Richard testified at trial that he left the car that night so the defendant could get in. Instead, he explains that his fingerprint was in the car (the defendant's wasn't) because he was in the car before and after the shooting. And the only corroboration for his story comes from hearsay—testified to by himself. In all, forensic evidence placed the killer in a particular seat. An admission and fingerprints placed Richard in that same seat. Unlike the majority, I make very little of the fact that Richard (a seriously compromised witness) claimed (without corroboration) that the defendant also occupied that seat.

In addition to the absence of physical evidence implicating the defendant, no firsthand eyewitness testimony implicated him, either. The only statement of an eyewitness to the murder was Terror's unsworn, out-of-court statement, delivered through Richard. Even if I assume that this statement was admitted in error, as the majority does for purposes of assessing harm, the state would be left with no physical evidence *or* eyewitness testimony connecting the defendant to the crime. Only one eyewitness, Richard, even placed the defendant in the vehicle with the victim near the time of the killing. This compels the state to concede that its case rested on the testimony of Thomas and Richard.[5] But as the trial court aptly observed, both suffered from serious credibility problems.

This leads to my second point: although Thomas' and Richard's testimony, if believed, was perhaps sufficient

_____

[5] In closing argument to the jury, the prosecutor conceded that the state's case depended on the testimony of Thomas and Richard: "[T]his case is not about the physical evidence. . . . There are two crucial witnesses in this case, and there's no doubt about that. That is, Mr. Thomas and Mr. Richard. . . . [I]n this case, it's whether or not you find those two individuals to be believable and credible." On appeal, the state relies exclusively on their testimony as evidence of the defendant's guilt.

State *v.* Ayala

to uphold the verdict, the harmlessness inquiry is more searching than a sufficiency of the evidence inquiry. E.g., *Kotteakos* v. *United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) ("[t]he [harmlessness] inquiry cannot be merely whether there was enough to support the result"); *United States* v. *Ince*, 21 F.3d 576, 583 (4th Cir. 1994) ("more [stringent]" harmless error inquiry "does not ask simply whether we believe that irrespective of the error there was sufficient untainted evidence to convict," but "whether we believe it highly probable that the error did not affect the judgment" [internal quotation marks omitted]).

In deference to the jury, the majority declines to "second-guess" the credibility of Thomas and Richard. Although for some issues raised on appeal, we must defer to the jury's credibility determinations, our cases make clear that we may consider witness credibility in a harmless error analysis.[6] E.g., *State* v. *Ritrovato*, 280 Conn. 36, 57, 905 A.2d 1079 (2006) (error not harmless when state's case lacked independent physical evidence or witnesses and "[victim's] credibility was crucial to successful prosecution of the case"); *State* v. *Cortes*, 276 Conn. 241, 256, 885 A.2d 153 (2005) (error not harmless "in a case that essentially turned on the jury's crediting [the complainant's] version of the events"). Indeed, we have acknowledged that cases that present the jury with a "credibility contest characterized by equivocal evidence . . . [are] far more prone to harm-

---

[6] We have also noted that deference to the fact finder is most appropriate when an "assessment of the credibility of the witnesses . . . is made on the basis of its *firsthand observation of their conduct, demeanor and attitude*." (Emphasis added; internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 223. Here, however, the evidence undermining the witnesses' credibility—namely, various forms of self-interest, including the desire to lessen or eliminate their criminal liability—is apparent not from subjective firsthand observation, but objectively from the transcript and exhibits offered by the parties. We also have the determination of another fact finder—the trial judge—who observed the witnesses' testimony and determined that Thomas and Richard were not credible.

State *v.* Ayala

ful error.'' (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 306 Conn. 816–17.

Similarly, in other contexts, we have recognized the weakness of a case that is based largely on a defendant's own incriminating statements, when the veracity of the statements was questionable and the state presented little physical or eyewitness evidence to support the defendant's conviction. See, e.g., *State* v. *A. M.*, 324 Conn. 190, 213–14, 152 A.3d 49 (2016) (discussing weakness of state's case in adjudicating claimed violation of defendant's fifth amendment right to remain silent when state presented ''no physical evidence,'' and key witness gave ''inconsistent statements'' and ''refused to answer certain questions during her direct testimony''); *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 323, 112 A.3d 1 (2015) (discussing weakness of state's case in [context of claim pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] when state presented minimal physical evidence and no eyewitnesses, and its case ''rested almost entirely on [the petitioner's own] incriminating statements'' that were made in unreliable circumstances); *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 691, 51 A.3d 948 (2012) (discussing weakness of state's case in context of claim pursuant to [*Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] when primary evidence implicating petitioner was testimony of two witnesses who relayed purposed admissions by petitioner, and witnesses were ''subject to substantial impeachment evidence that they had implicated the petitioner only to serve their own needs—either by directing suspicion away from their own involvement in the murders or by procuring more favorable outcomes in their other, unrelated criminal matters'').

Because of the broad language of our harmful error test, requiring that we examine the ''overall strength

State *v.* Ayala

of the prosecution's case,'' and because of the wide variety of cases in which courts have considered ways in which a key witness' credibility has been undermined, I respectfully disagree with the majority to the extent it suggests we may consider witness credibility only when the claimed error relates to the admission or exclusion of impeachment evidence. Here, rather than impeachment, the claimed error relates to corroborative evidence. But both types of evidence bear on whether a jury would be likely to find the state's witnesses believable. That, I believe, is the larger point to consider when assessing the overall strength of the state's case and the ultimate question of whether we, as an appellate court, have ''a fair assurance that the error'' in admitting unreliable, corroborative evidence ''did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 306 Conn. 809; accord *Holmes* v. *South Carolina*, 547 U.S. 319, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (''where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact''). Thus, although the jury still *could have* found the defendant guilty without Terror's hearsay statement by believing Thomas' and Richard's other testimony, that is not the question. Removing Terror's statement from the evidentiary calculus removes critical corroboration from Thomas' and Richard's testimony, thus making them even less believable than they already were. This leaves me, at least, without a fair assurance that the trial court's error in admitting Terror's hearsay statement did not substantially affect the verdict. See *State* v. *Favoccia*, supra, 809. On the basis of the self-serving nature of Thomas' and Richard's testimony and the discrepancies in material aspects of their stories, I am persuaded that their credibility was subject to significant challenge. The trial

State *v.* Ayala

court's specific conclusion that they were not credible fortifies me in my view.

Both witnesses' testimony was clearly self-serving. The jury heard that Thomas only came forward about the victim's murder two years later, just after he had been arrested in connection with other crimes and in exchange for a potential sentence reduction as part of a plea agreement with federal authorities. Similarly, Richard admitted he was an accomplice in the victim's murder and was seeking consideration from the state in return for his testimony. He apparently was never charged. Moreover, as previously described, Richard exhibited enough suspicious behavior to warrant a third-party culpability charge. He also conceded that he had lied about the incident several times, offering three versions of his story over the years.[7]

There were also material discrepancies in the testimony of Thomas and Richard regarding encounters that preceded the victim's murder. One encounter involved Terror's apparent desire to have the victim killed. In short, Thomas and Richard agreed that a meeting occurred in the bedroom of the home of Davon Youmans, another Piru member, at which the victim was discussed, but Thomas and Richard disagreed on the meeting's timing (morning versus evening), attendees (whether Thomas and the defendant were there), and results (whether Terror asked and whether the defendant volunteered to kill the victim).[8] In my view, these discrepancies cast doubt on material facts: whether

[7] Because Richard did not reside in Connecticut, he was flown here for trial by the state, which also provided him room and board.

[8] The majority concludes that these inconsistencies are not "irreconcilable" by speculating that there were perhaps two meetings. Or that Thomas was mistaken about Richard's presence. Anything is possible. But in considering the strength of the state's case, I cannot simply overlook multiple discrepancies on significant details in the testimony of two crucial witnesses because an innocent explanation is "entirely possible . . . ." This conjecture does not leave me, as it does the majority, with any more of a fair assurance that the erroneous admission of the Terror statement did not substantially affect the verdict.

State *v.* Ayala

and when the conspiracy to kill the victim formed, and whether and when the defendant formed the intent to kill him.

The other encounter involved the witnesses' final interaction with the victim. Both Thomas and Richard agreed that the victim showed up at Youmans' house in the early evening prior to the murder, but their stories diverged from there. Thomas testified that the victim walked to Youmans' front porch only and did not enter the house. Thomas said that he and Richard then went onto the front porch to warn the victim that his life was in danger. At that point, the victim became upset and later got into his vehicle and left. Thomas then left with Gilliams and went home for the night. Once again, however, Richard's version of this encounter substantially differed. Richard testified that the victim walked into Youmans' kitchen, purchased marijuana from someone in the house, and left with Richard, Terror, and Gilliams to smoke it in the victim's vehicle, where he ultimately was killed. Richard testified that the victim had not been to the house earlier in the day. Notably, Richard did not mention a conversation in which he and Thomas warned the victim of the threat on his life. In sum, either Thomas misremembered or fabricated Richard's presence at his last face-to-face interaction with his close friend or Richard hid his involvement in this meeting from the court. Either explanation bears on the witnesses' credibility.

Third, I consider the role Terror's hearsay statement (purporting to describe the murder from inside the vehicle as it occurred) played in relation to Thomas' and Richard's testimony (purporting to describe events from well before and after the murder occurred). Unlike the majority, I am not given a "fair assurance" that the erroneous admission of Terror's statement was harmless simply because it contained some of the information already testified to or because it came in through Richard. Certainly, Terror's statement was cumulative

State *v.* Ayala

of Thomas' and Richard's statements in a general sense —all three identified the defendant as the shooter. But to the extent their statements were cumulative, they were also corroborative. Because Thomas' and Richard's credibility was central to the case—and, as previously described, in doubt—I cannot say that having a third voice identify the defendant as the shooter did not make Thomas' and Richard's firsthand accounts more believable to the jury, even if they were not believable to the trial judge. Terror's statement was also distinct from Thomas' and Richard's, though. It brought the jury far closer to the murder in time and space. It provided the only account that allowed the jury to visualize the defendant receiving the gun, preparing it to fire and pulling the trigger. And the prosecutor alluded to it in closing argument to the jury: "Richard indicated to you he got kicked out [of the vehicle] because there was not enough room or not enough pot. The reality is, is Terror and the defendant do not want him there. They need to be able to be in the backseat and be able to maneuver . . . .''

Fourth, I note the absence of cross-examination. Although the defendant cross-examined Richard, the conduit, he could not question Terror, the declarant. Although no more was legally required, I cannot conclude that the defendant's inability to ask Terror himself about the out-of-court statement was irrelevant when considering its effect on the jury. The defendant was unable to probe Terror's veracity when the statement in question exonerated Terror at the expense of the defendant. Especially in a situation like this, I am mindful of Justice Marshall's admonition that "[t]he conspirator's interest is likely to lie in misleading the listener . . . . It is no victory for common sense to make a belief that criminals are notorious for their veracity the basis for law." (Internal quotation marks omitted.) *United States* v. *Inadi*, 475 U.S. 387, 404–405, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986) (Marshall, J., dissenting).

State *v.* Ayala

Ultimately, I disagree with the majority's assertions that Terror's firsthand account of the murder ''added very little'' and ''simply was not pivotal'' to the state's case. To summarize, Terror's statement was the sole eyewitness account of the murder in a case bereft of physical evidence pointing to the defendant. It served to counter ''a wealth'' of evidence pointing at Richard. It corroborated Thomas' and Richard's self-serving testimony, which, according to the trial court, otherwise went uncorroborated. It added details to the state's case, which the prosecutor referenced in closing argument, that Thomas' and Richard's secondhand accounts did not provide. Finally, because Terror's statement was hearsay, it largely went untested by cross-examination. Given my view that this was a close case, even when considering *all* of the evidence, I cannot agree that the erroneous admission of Terror's supposed statement to Richard was harmless. To the contrary, I would hold that the defendant carried his burden of demonstrating that the admission of this statement was harmful. In light of this conclusion, I must address the merits of the defendant's evidentiary claim.

II

The defendant challenges the admission of a certain hearsay statement allegedly made by Terror to Richard one week after the victim's murder. That statement, which purported to describe how the defendant carried out the murder, is recounted in part I A of this dissenting opinion. The trial court admitted the statement under the coconspirator exception to the hearsay rule. See Conn. Code Evid. § 8-3 (1) (E).[9] I conclude that this was an abuse of discretion because there was not a reasonable basis to determine whether the statement

_____

[9] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: ''The following are not excluded by the hearsay rule . . . (1) . . . A statement that is being offered against a party and is . . . (E) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . .''

State *v.* Ayala

was made "in furtherance" of a conspiracy, as required by our rules of evidence.

A

A hearsay statement of a party opponent is admissible on the basis of the very nature of the adversary system itself. "[O]ne cannot claim that his own statement should be excluded because it was not made under oath or subject to cross-examination or in view of the trier of fact. . . . [T]he party himself is present and can explain, deny, or rebut any such statement." 4 C. Mueller & L. Kirkpatrick, Federal Evidence (4th Ed. 2019) § 8:44; see also Fed. R. Evid. 801, advisory committee notes, 28 U.S.C. app., p. 1063 ("[a]dmissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system").

Evidence codes extend this theory in several ways. Most relevant here, they rely on agency concepts to justify admitting hearsay on the basis of the declarant's relationship to a party in the case at issue. See, e.g., Conn. Code Evid. § 8-3 (1) (C) (admissions of individual authorized, under substantive agency law, to speak on party's behalf); Conn. Code Evid. § 8-3 (1) (D) (admissions of party's agent or employee).

The coconspirator exception is one type of agency based extension. See J. Levie, "Hearsay and Conspiracy: A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule," 52 Mich. L. Rev. 1159, 1163 (1954) ("[t]he usual reason given for the co-conspirators' exception is the classical agency rationale that conspirators are co-agents and, as such, liable for each other's declarations"). Its roots in agency theory are tenuous, though, making it "[t]he most controversial extension," according to some prominent commentators.[10] 30B C.

[10] Although agency is the most common justification offered for the coconspirator exception, other common justifications include reliability (i.e., a coconspirator's statement made to further a conspiracy is a verbal act in the best interests of the conspiracy and, therefore, likely true) and necessity.

State *v.* Ayala

Wright et al., Federal Practice and Procedure (2019 Ed.) § 6777. As another commentator has stated, "the exception is fraught with problems. In terms of theory, it is an embarrassment." C. Mueller, "The Federal Coconspirator Exception: Action, Assertion, and Hearsay," 12 Hofstra L. Rev. 323, 324 (1984). Even the drafters of rule 801 of the Federal Rules of Evidence conceded that agency theory only offers limited justification for a coconspirator statement: "the agency theory of conspiracy is at best a fiction and ought not to serve as a basis for admissibility beyond that already established." Fed. R. Evid. 801, advisory committee notes, 28 U.S.C. app., p. 1064.

The "in furtherance" requirement plays an important role in justifying the coconspirator exception to the hearsay rule. It is meant to ensure that the hearsay statement at issue is sufficiently tied to a party in the case so that the agency theory plausibly holds: "To fall within the [coconspirator exception], the co-conspirator's statement had to be made 'in furtherance of' the conspiracy, a requirement that arose from the agency rationale that an agent's acts or words could be attributed to his principal only so long as the agent was acting within the scope of his employment." *Bourjaily* v. *United States*, 483 U.S. 171, 188–89, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (Blackmun, J., dissenting); 30B C. Wright et al., supra, § 6780 ("[o]nly when the conspirator is trying to further the conspiracy can the [agency] fiction be maintained"). Indeed, although the drafters of the Model Code of Evidence in 1942 eliminated the "in furtherance" requirement, the drafters of the Federal Rules of Evidence retained it "because they adjudged it a useful device for protecting defendants from the very real dangers of unfairness posed by conspiracy prosecutions." (Internal quotation marks omitted.)

See C. Mueller, "The Federal Coconspirator Exception: Action, Assertion, and Hearsay," 12 Hofstra L. Rev. 323, 335 (1984) ("[s]ince conspiracies are dangerous to society and hard to prove at trial, a relaxation of the hearsay doctrine is required").

State *v.* Ayala

*United States* v. *Perez*, 989 F.2d 1574, 1577–78 (10th Cir. 1993). This decision "should be viewed as mandating a construction of the 'in furtherance' requirement protective of defendants, particularly since the Advisory Committee was concerned lest relaxation of this standard lead to the admission of less reliable evidence." (Internal quotation marks omitted.) *United States* v. *Lang*, 589 F.2d 92, 100 (2d Cir. 1978). "[S]ome courts construe this aspect of the rule so broadly that anything related to the conspiracy is found to be in furtherance of its objectives. This, of course, is precisely the result the Advisory Committee sought to avoid by retaining the 'in furtherance' requirement." *Garlington* v. *O'Leary*, 879 F.2d 277, 283 (7th Cir. 1989); see also 30B C. Wright et al., supra, § 6777 ("the rule, and particularly its 'in furtherance' requirement, can best be viewed as an effort to limit the admission of co-conspirator statements, rather than an invitation to let such statements flow unchecked through the courthouse doors"). Thus, the "in furtherance" element of the exception "is a limitation on the admissibility of coconspirators' statements that is meant to be taken seriously." (Emphasis omitted.) *Garlington* v. *O'Leary*, supra, 283.[11]

To determine whether a statement is in furtherance of a conspiracy, courts ask "whether some reasonable

_____

[11] "Case law suggesting that courts interpret the phrase in furtherance of the conspiracy broadly, should not be viewed as adding anything to the rule, but instead as respecting its broad verbiage. Indeed, the Advisory Committee's comments on the rule suggest the opposite intent. Courts, consequently, often interpret the rule's requirements, and particularly the in furtherance requirement, strictly." (Footnotes omitted; internal quotation marks omitted.) 30B C. Wright et al., supra, § 6780.

Even so, many argue that the "in furtherance" requirement "seems an imperfect measure" of reliability. C. Mueller, supra, 12 Hofstra L. Rev. 335. Justice Thurgood Marshall has written: "That a statement was truly made in furtherance of a conspiracy cannot possibly be a guarantee, or even an indicium, of its reliability. . . . The conspirator's interest is likely to lie in misleading the listener . . . . It is no victory for common sense to make a belief that criminals are notorious for their veracity the basis for law." (Citations omitted; internal quotation marks omitted.) *United States* v. *Inadi*, supra, 475 U.S. 404–405 (Marshall, J., dissenting); see also C. Mueller, supra, 357 ("[a] statement may actually further a conspiracy simply by being plausi-

September 24, 2019

276 SEPTEMBER, 2019 333 Conn. 225

State *v.* Ayala

basis exists for concluding that the statement furthered the conspiracy.'' (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 845, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). A statement furthers a conspiracy if it ''in some way [has] been designed to promote or facilitate achievement of the goals of the ongoing conspiracy . . . .'' (Internal quotation marks omitted.) Id., 844. This includes a statement ''prompting the listener— who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity . . . .'' (Internal quotation marks omitted.) Id. The declarant does not have ''to ask a third party expressly to do something to further the conspiracy''; (internal quotation marks omitted) id., 845; and the statement need not actually further the conspiracy. *State* v. *Peeler*, 267 Conn. 611, 631, 841 A.2d 181 (2004). Whether a statement was made ''in furtherance'' of the conspiracy is ultimately a question of the declarant's intent. See id., 632 (''[i]t is enough that [the statement is] intended to promote the conspiratorial objectives'' [internal quotation marks omitted]).

Although, as stated, a statement from a coconspirator to a nonconspirator may be ''in furtherance'' of the conspiracy in some cases, ''statements to non-conspirators informing them of the conspiracy will generally not qualify for admission because such statements are rarely in furtherance of the conspiracy.'' 30B C. Wright et al., supra, § 6780. ''[A] statement that merely . . . spills the beans, with no intention of recruiting the [nonconspirator] into the conspiracy does not further the conspiracy . . . .'' (Citation omitted; internal quotation marks omitted.) *State* v. *Carpenter*, supra, 275 Conn. 845. Examples of statements that evidence a lack

ble to its audience, which means that it may well fit within the circumstances without being true''); D. Davenport, ''The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,'' 85 Harv. L. Rev. 1378, 1387 (1972) (''[m]any statements actually in furtherance of an alleged conspiracy will be quite unreliable in whole or in part'').

State *v.* Ayala

of intent behind them include a "merely narrative" description of events underlying the conspiracy; e.g., *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir.), cert. denied sub nom. *Lavery* v. *United States*, 493 U.S. 933, 110 S. Ct. 324, 107 L. Ed. 2d 314 (1989); idle chatter; e.g., id.; and bragging; e.g., *United States* v. *Warman*, 578 F.3d 320, 339 (6th Cir. 2009). In assessing a statement to a nonconspirator, a court must often undertake a "careful examination of the context in which it was made." *United States* v. *Shores*, 33 F.3d 438, 444 (4th Cir. 1994), cert. denied, 514 U.S. 1019, 115 S. Ct. 1365, 131 L. Ed. 2d 221 (1995).

B

At trial, the defendant argued that Terror's statement was not made "in furtherance" of the conspiracy because there was not enough evidence about Terror's intent in making the statement. The state offered several possible explanations, but little proof, of what Terror's intentions might have been. The trial court conceded the question was "problematic" but nonetheless admitted the statement. It inferred Terror's intent almost entirely from Richard's knowledge of incriminating information. In ruling on the defendant's objection, it noted that Richard was a member of Piru. Although the trial court determined, based on the evidence presented up to that point, that Richard was not a participant in the murder of the victim, it noted that he "was involved later in assisting the conspirators," thereby learning "extremely prejudicial information" about the circumstances surrounding the murder. From this, the court extrapolated that Terror more likely than not intended to make this statement "to further involve [Richard]" in the incident and "to discourage [Richard] from going to the police and revealing what he knew, thereby bringing him into the conspiracy to conceal the murder. In my view, on the basis of the very little we know about the statement itself, the context in which it was uttered and the actors involved, this is a huge leap of logic with

State *v.* Ayala

virtually no evidence to support it. I believe the trial court should have excluded the statement because there was not a reasonable basis to determine whether Terror intended it to "further" the conspiracy and other indicia of reliability were lacking.

In discerning a declarant's intent, our cases suggest that a third party's knowledge of incriminating information may be a factor. But we have typically relied on evidence more closely tied to the declarant himself, such as a declarant's requests for help with the conspiracy, the declarant's membership in a related conspiracy with the third party, the difficulty the declarant would have in hiding the conspiracy from the third party, a specific statement of intent by the declarant to bring the third party into the conspiracy, or a series of later events to suggest the declarant was ultimately successful in recruiting the third party to join or help with the conspiracy.

For instance, the state cites *State* v. *Camacho*, 282 Conn. 328, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007), in which the declarant's statements to his live-in girlfriend were intended "to secure her continued cooperation in the concealment of the crimes," similar to Terror's alleged intention of convincing Richard not to go to the police. Id., 356. But in *Camacho*, we considered as evidence of this intent more than just the fact that the girlfriend had seen the declarant behave suspiciously after a murder (e.g., hiding a gun, scrubbing clothes). We also observed that the declarant had asked her to assist him in covering up the murder (e.g., to avoid talking to the police). Id. We noted the fact that the girlfriend was an active coconspirator with the declarant in a related drug-selling operation. Id. Finally, we relied on the fact that it would have been " 'difficult, if not impossible' " for the declarant to hide the conspiracy from his girlfriend any longer, given their romantic relationship and that they lived together. Id., 357.

State *v.* Ayala

The defendant points to two other cases, and in each we cited evidence of the declarant's intent beyond the third party's knowledge of incriminating evidence. In *State* v. *Pelletier*, 209 Conn. 564, 552 A.2d 805 (1989), the declarant's statements to his wife were intended "to lessen any emotional trauma the [conspiracy] would cause [his wife]," which would ensure her "further cooperation . . . ." Id., 578. As evidence of this intent, this court relied not only on the fact that the wife's house was being used as the base for hiding the fruits of the conspiracy, but also on the fact that the declarant had specifically "indicated that he wanted to tell [his wife] about the [conspiracy] before she heard about it on the news." Id., 577.

In *State* v. *Carpenter*, supra, 275 Conn. 785, the declarant's statements to his son were intended to be "the first step in gaining . . . cooperation, moral support, future assistance and guaranteed silence in the aftermath of the [conspiracy]." Id., 846. As evidence of this intent, we relied on the fact that it would have been "difficult, if not impossible, to conceal the conspiracy" because the declarant and his son lived together. Id., 847. Moreover, we could discern "no other logical explanation" for why the declarant would have made the statements. Id., 846. We also cited a series of "[s]ubsequent events" where the declarant and his son worked together to carry out the conspiracy, a contract murder (e.g., the son's knowing assistance in finding the intended victim of the conspiracy, the declarant's offer to let his son kill the victim, and the son's help in disposing of the murder weapon). Id., 847.

Notably, we also concluded in *Carpenter* that other statements by the declarant to his longtime girlfriend were not made in furtherance of the conspiracy. Id., 851–52. Initially, the declarant had disclosed the existence of the conspiracy to his girlfriend. Id., 849. In a later conversation, he told her that he felt threatened by the man who had hired him to commit the murder.

State *v.* Ayala

Id. Noting that the girlfriend did not portray the conversation as a "serious discussion" and that she did not believe him, we concluded that the declarant's comments in this later conversation were "more akin to a casual reference to what was happening in his life than an attempt to induce [her] to take part in the conspiracy." Id., 852. There appeared to be no other evidence of the declarant's intent in making the statement.

In the present case, the trial court based its inference about Terror's intent on Richard's membership in the gang and his knowledge of incriminating information. I do not believe this is a reasonable basis for concluding that Terror's statement was made with the intent to further the conspiracy. Three reasons persuade me that it is simply too far of an inferential leap: the statement largely repeated what Richard already knew, the statement was presented to the court without any context, and Richard himself declined to suggest that Terror intended to bring him further into the conspiracy. On this record, I believe any inference that Terror feared Richard would inform the police about the murder and told him details about the murder in an effort to pull him into the conspiracy is too speculative to be reasonable.

First, the statement itself did not give Richard any new material information and, thus, there was little reason to believe it would have actually drawn him any further into the conspiracy. There was evidence that Richard already knew of the plan to kill the victim, what the murder weapon was, where it had come from, and who had pulled the trigger. He admitted he was in the vehicle just before the murder, that he heard the defendant confess just after the murder, and that he went to the scene a few minutes after that, got into the vehicle with the victim's body and tampered with evidence. The trial court agreed with the defendant that this was enough evidence *against* Richard to charge the jury on third-party culpability. In this light, the only new facts in Terror's statement were that Terror leaned

State *v.* Ayala

over the defendant while he prepared the gun and looked at the defendant before he fired. I cannot conclude that, given Richard's already extensive knowledge of and involvement with the conspiracy, this new information was of such significance that we can reasonably infer that Terror's imparting it to Richard was "designed to promote or facilitate" the goal of preventing him from going to the police, thereby furthering the conspiracy.[12]

Second, context does not help the state's case here, either, because, in short, we have none. We know only that Terror supposedly made this statement at some point during Richard's five or six days in New York (anywhere from two to eight days after the murder) and that this was the only conversation they had regarding the murder. When asked what he and Terror did in New York the rest of the time, Richard testified: "Nothing. Just walked around, and that was pretty much it." None of this limited context suggests that Terror's statement was intended to further the conspiracy to kill the victim. To the contrary, if Terror had intended to bring Richard further into the conspiracy by telling him more about it, presumably he would have mentioned it more than once over the course of Richard's near weeklong stay.

Third, Richard did not provide any insight into what Terror might have been thinking. The state failed to show that Richard believed Terror wanted to bring him further into the conspiracy, which was part of its proffer to the trial court.[13]

_____

[12] Unlike the majority, I consider there to be a fundamental difference between (1) evaluating, for evidentiary purposes, whether Terror's one hearsay statement describing the murder furthered the conspiracy by recruiting Richard, and (2) evaluating, for harmless error purposes, the weight Terror's two hearsay statements ordering the murder and describing the murder carried with the jury. See part I B of this dissenting opinion.

[13] In initially arguing against the defendant's motion in limine to preclude Terror's statement, the prosecutor suggested that bringing Richard to New York manifested Terror's concern that he might go to the police: "Richard, at this point, has left Connecticut and has now been in New York with the head Piru guy [Terror], and there's a concern on behalf of that head Piru guy. And, I think, it could be inferred, there's a concern on him on whether

State *v.* Ayala

In sum, we barely know anything about Terror, whose intent is the subject of the inquiry. And without any context, we know even less about his intent in making this statement to Richard—certainly nothing that would take Terror's statement beyond a "merely narrative" description of events, idle chatter or bragging. Instead, we know only that Richard already knew all of the material facts surrounding the murder and that he did not think Terror's conduct in New York was "in further- ance" of anything in particular. Because I believe the "in furtherance" requirement "is a limitation on the admissibility of coconspirators' statements that is meant to be taken seriously"; (emphasis omitted) *Gar- lington* v. *O'Leary*, supra, 879 F.2d 283; I conclude that this falls short of a reasonable basis on which to admit this evidence against the defendant.

Because of my previous conclusion that the defen- dant has demonstrated that the admission of this evi- dence harmed him, I would reverse the judgment of the trial court and remand the case for a new trial.

I therefore respectfully dissent.

---

or not they are going to let [Richard] go back to . . . Connecticut or whether he's going to talk to the police."

The state offered no proof at that time to support the inference that Terror was concerned about Richard going to the police. The next day, however, the state tried to bolster its claim by asking Richard about whether Terror and other members of Piru made Richard fear for his safety while in New York. The defendant renewed his objection. At this point, the state proffered that Richard would testify that he felt compelled to go to New York out of fear for his safety, which was connected to his loyalty to the gang: The prosecutor argued to the court: "The witness has been very clear that he felt pressured by the defendant to do certain acts and felt that he had to go to New York with Terror. It's [the] same sides of the same coin. It's this loyalty, but also concerns for his safety." But Richard never said this on the witness stand. Instead, when asked why he went to New York, he responded only that it was "to prove [his] loyalty" to Terror, his superior. When asked to draw the connection between gang loyalty and safety that the state had relied on, he did not do so and replied only in general terms: "Well, I mean, when you're in a gang, you know, or when you're in the streets, period; there's certain people, you know, you got to watch because it's dangerous." Contrary to the state's representation, at no point did Richard say or even imply that he felt frightened of Terror or that Terror tried to bring him further into the conspiracy.